Argument not to exceed 15 minutes per side, Ms. Stepanski, you may proceed with the hearing. Thank you. Good morning, Your Honors. May it please the Court, Marcy Stepanski on behalf of the defendant about Mr. Clous. I'd like to reserve three minutes for rebuttal, please. As the Court knows, this case arose from a Board of Commissioners meeting that was conducted remotely. We have provided copies of the video of the meeting and they're accessible online as well. The subject matter of this meeting in large part had to do with a resolution that was passed the year prior having to do with a Second Amendment gun sanctuary designation passed by the County Board of Commissioners. At this particular meeting a year later, after the January 6th insurrection, there were members of the public who appeared and expressed their disapproval of that prior Second Amendment resolution. Plaintiff, when she began to speak about her objections, she had a number of things that she said, but part of it was objecting to the resolution itself, talking about her perception that the resolution somehow emboldened the Proud Boys, how it changed the gun culture or the culture in northern Michigan, the environment from a hunting culture to a gun culture. And then she specifically asked the commissioners to make some sort of public statement expressing their position on these issues. And in doing so, during this remote meeting in the informal solitude of his own home, the commissioner picked up, left the room, picked up a gun that he had momentarily, like a second or two, displayed it on the screen, and then set it down and kind of chuckled to himself in jest. Now, I'm not here to defend the Proud Boys. Not a fan. But even taking plaintiff's position to the extreme that somehow that was, you know, seen as some support of the Proud Boys versus the Second Amendment or the county designation, the resolution that designated the county a sanctuary, he's entitled to an unpopular opinion, okay? So what we have here, what this boils down to with respect to our qualified immunity appeal, there are two issues. One is whether a constitutional violation occurred, and the second is whether the particular right at issue was clearly established in a particular sense, such that... Just one contextual point. I've only watched the part of the meeting where this happens. So I've watched where she starts speaking, he appears, leaves, she finishes. Was there ‑‑ I'm just trying to figure out why he did what he did. In other words, I get symbolic speech, so that's a sense in which I could understand it. But was there ‑‑ earlier in the meeting, I'm just trying to remember this from the record, was there frustration that commissioners were saying to speakers, we don't want you commenting on these things? So I'm trying to just make sure you're answering the question I have in my mind. The question I have in my mind is whether he was saying, okay, fine, I'm not talking anymore. You guys have told us not to talk and comment on your things, but this ain't talking. So clever me, I figured out a way to disagree with you without using my mouth. You got to it before I did, Your Honor, and that's a point that I ‑‑ it's an excellent point, and it is very important in the context of this, because prior to the plaintiff speaking, another member of the public, Kate Dahlstrom, spoke. And she had some objections. She was calling the resolution ill‑advised and a number of other things. She was opposed to it. And she was also talking about the Proud Boys, the group Proud Boys, and saying that they're an extremist group, they're a hate group, and if you have any association with them, you know, I would like to know. I had sent an email before trying to ferret that out. No one else responded. So after she concluded her remarks, the chairman spoke and said, you know, I object to being associated with, you know, a group that is considered a hate group or an extremist group. And he went on for a minute or so, and then another commissioner said to him, hey, is this really appropriate for public comment that you should be speaking? And so in that context, when the plaintiff is imploring the commissioners to make a public statement, it makes sense for the commissioner to not actually speak it, but to engage in some ‑‑ So how do you deal with this point? I mean, you know, the retaliation is ‑‑ I'm struggling with getting my head around the retaliation part of this, but there's a way in which it's a simpler case, arguably. I mean, and I know this isn't your fact pattern, but, you know, government officials picking up AK47s or whatever it was, even without pointing it, even virtually, could certainly be a signal to stop. In other words, it's just like pure speech suppression. It's not retaliation, it's suppression. So isn't there a risk that when someone does something like this, that that's the real problem? We don't want government officials symbolically or directly saying, stop, I don't want you talking anymore at this meeting, even though this is a meeting where we're supposed to allow public comment. Isn't that a way in which ‑‑ and I realize she kept talking, so her speech was not suppressed, which is, I suppose, why it probably is a retaliation claim. But isn't this a real risk if someone does what he did? Well, Your Honor, that's why it's so important to consider the context here. And in our reply brief, we verbatim quote Kate Dahlstrom's comments as well as the plaintiff's. And there's a part in there that's highlighted, even where he actually gets up and goes and retrieves the gun and then displays it momentarily. And it's in direct response to her request to make a public statement. This is the way you state the request. You argue that plaintiff had specifically requested that the commissioners publicly express their positions on the Second Amendment issues. But what, in fact, the complaint says was that she discussed the Proud Boys' links to political violence and asked the commission to, quote Kate, please make some sort of public statement for the community that you do not accept the behaviors of violent groups. So she's asking about those behaviors. And in response to her request, what he does is he goes and picks up his gun and brings it and displays it to her. I know you say there's a jest, but I've looked at that video a lot of times and the facial expressions do not seem to be saying to me it's a joke. It seems to me that it is a smirk about her request. And my concern is the discussion of violence that preceded his display of the gun, why doesn't that absolutely show his display of the gun to be a threat? Isn't that what the complaint alleges? Well, that's what the complaint alleges, Your Honor, and normally we would have to accept those allegations as true if we didn't have video of the incident here. And I understand what you're saying in terms of how you interpret the video. But right before he goes and gets the gun, she's talking about not just the Proud Boys and their behaviors, but she starts talking about the gun culture in northern Michigan. She had just spoken about the resolution like two sentences before that. And I guess my point is, even taking it to the extreme that somehow this is perceived to be symbolic speech as, yeah, I support these guys, it's unless it demonstrates or indicates some sort of imminent threat, and that comes from the Baltimore case, there's the Baltimore Sun case out of the Fourth Circuit where they were interpreting our case in the circuit, 30SX. And what they said is the governor there, her speech was protected, even if it was intimidating to the plaintiff, unless it intimated some sort of imminent threat, punishment, adverse regulatory action or sanction. Well, we're talking about Sixth Circuit law. I'm looking at Zillage. On the Sixth Circuit law, the court concluded that no reasonable official could possibly believe that it is constitutionally permissible to retaliate against a political opponent with physical threats, harassment and vandalism. I know we don't have the vandalism here, but the physical threat is alleged in this complaint. And we are bound by what is alleged in this complaint. Well, in Zillage, if I could, Your Honor, what was alleged in that case is that the defendants had threatened to break the plaintiff's legs. And there was no other reason for them to say that other than to be retaliatory. In this case, that's why it's so... I'm just struggling with that analogy, because is your argument that you can't have a retaliation claim stated in a complaint for a threat unless you match that statement that we're going to break your legs? I don't think the law requires that. No, it doesn't require that, Your Honor. But as we have all seen over the last 25 years, the Supreme Court has gotten much more... Their conversation about qualified immunity and what the particularized right needs to be has evolved over time. And they've held courts to a higher standard. They require a more probing inquiry of what the actual facts are in the case than just a generalized statement of you engage in retaliation, it's a violation of the First Amendment. I'm not saying we have to have a case that says we're breaking his legs, but this case is so different because the plaintiff in our case implored them to make, quote, some sort of public statement to the community on what their positions were in this case. His position was unpopular. About what their positions were about accepting the behaviors of violent groups. And then he goes and gets a gun. Well, she went on to talk about the gun culture in northern Michigan and gun ownership rights before he displayed the weapon, before he displayed the gun. And granted, his opinion's unpopular. That's why he's not running again. I mean, the remedy is at the election box and it worked, okay? But in terms of her asking, that's why our case is so different. And there is no clearly established case on point where someone is imploring someone to make a public statement, there was conversation earlier, the chairman was reprimanded by another commissioner saying, we're not, we shouldn't be making comments during public, we shouldn't be speaking and making these remarks during public comment. So then they're limited to a symbolic gesture. Counsel, I'm going to interrupt you just because I see you're about to run out of time and I know we're trying to stay on track here. Doesn't your position with respect to what his symbolic speech is require us to make an inference in favor of your client rather than an inference in favor of the plaintiff, which we're required to do, and the inference that she's drawing is that this was actually a threat, not that this was necessarily just some statement of support for this measure that passed regarding the Second Amendment. So great question. And that would be true with respect to just the elements of the claim, potentially, but not with respect to the second prong of qualified immunity that requires a similar case and a similar, it doesn't have to be exact, but it's got to be something that would put this defendant on notice, that if he were to engage in this type of symbolic speech, he would know beyond debate, is what the court requires, that this would be prohibited in violation of the First Amendment. And in this context, there's just no case that they've provided that even comes close. In fact, the number of cases that they listed in their brief read in the collecting cases therein didn't even raise qualified immunity, or if they did, it wasn't properly before the court. Thank you. Thank you, Your Honor. Good morning. Blake Ringsmith on behalf of the plaintiff, Patricia McIntosh. What is the threat? I mean, what is the threat that, I assume the threat of, you know, we talk about inferences from the complaint. The threat isn't that he's going to shoot her. I assume that's not it, but maybe it is. I'm just curious, what are the inferences we should draw about the adverse action that he's threatening because of her speech? Certainly. And is this court future harm? Be quiet? I don't want to hear that. No, no, let's just do it carefully. So one possibility is you think the complaint includes the possibility he's going to physically harm her with this gun. That's correct. And as the court pointed out, there was no belief that he was going to shoot her through a zoom. No one asked whether the gun was loaded for a reason, right? Wouldn't make a difference, would it? Right. And so the court raises an excellent point in the questioning. When you bring out a gun, when you're not at a gun rally, I think there is a very reasonable and logical inference that there is a threat in the air. And that is if you keep this up, then who knows what's going to happen to you. And with respect to whether the right to be free of the threat of physical harm. The reason I'm asking is I quite appreciate the point that a gun can be used to suppress speech. That makes sense to me. And that would be not a retaliation case, that would be speech suppression, right? I mean, whether a live meeting or a virtual meeting, you're stopping people from speaking without saying stop speaking, but doing it in this indirect way with a symbol seems quite problematic. But your case isn't a speech suppression case, right? I mean, she said all she wanted to say, that's just not the claim. So if the threat is physical harm, you keep talking, this is what's going to happen. You do have a plausibility issue here. That strikes me as on the table. Well, it may be if we were way down the road. No, no, no. Motion to dismiss implicates plausibility, right? That takes ball and trombly. Your Honor, if the risk of being blunt, if you and I were in a heated disagreement of a very deep nature, and we left on bad terms, and then I sent you a picture of me holding a gun, isn't that a threat? I believe that's a threat. I believe that's a reasonable inference, that there is a threat in the air because you and I disagree. And the context of what is happening here is extremely important. This was a heated discussion between citizens and their elected officials. So to help me out, I mean, I've seen this part of the video. I thought it looked, that was not obvious to me. I realize accounts of it say that there was some questioning of whether commissioners could be commenting on what citizens were saying. Is that where it gets really heated? Is that what you mean? No, before that, where the prior citizen accuses the commission generally, and specifically Defendant Klaus, Appellant Klaus, and Chair Henschel, of supporting the Proud Boys and their violence. Because this comes two weeks on the heels of the January 6th insurrection. And the chair accuses Ms. Dahlstrom, the citizen that spoke just before my client, of lying and telling her that her opinions were not welcome in public comment. And that is in the record. And, Your Honor, you said something that I think is very telling. You said, I'm trying to figure out why he did what he did. Well, at this point, the inference, if you were to say that based on looking at it, then the video does not utterly discredit our allegations, which is what the Scott v. Harris says has to happen. Judge Stranch says she's looked at it and looked at his facial expressions, and it looks threatening. That is one reasonable inference. And then the trial judge, Judge Green, said the same thing. He looked at this many, many times, and he came away with the... So your motion to dismiss, we have cases that talk about, gee, if you're not sure, allow more fact discovery either before trial or more fact discovery before summary judgment, where it's a different standard of review, right? That would be a classic argument in a motion to dismiss setting. What's the additional discovery here that will illuminate the answers to these questions? Or do you think, well, I don't know, what is the additional discovery? Well, what I would say is I've not been able to depose anybody, but let's just say I deposed the defendant in this case. And let's just say he admitted, yeah, I was very angry at her attacking the Proud Boys, who I have said publicly are great guys, very respectful. And so it really made me angry, and I didn't want to hear that anymore. And so I went and got a gun because I thought that sent a message that she should stop talking about the Proud Boys, who I support. And context poses... Isn't it all going to be assessed objectively? Objectively in the sense of what your eyes see. You think it could turn, it could change either better for him or worse for him based on his motives? That's exactly what I believe the case law says, is with these allegations that are to be taken as true, it really turns on motive. That's what the Block v. Ryber case says, that's what Thaddeus X says. It's really about his motive. That's what the Rudd case that lays out all of those cases, it really comes down to what his motive was. And when you say that you watched the video and you can't figure out why he did what he did, then the reasonable inference that goes to my client is that it was as alleged that he did it out of motivation. So it is important that I be able to ask him, what if I find an email that says, yeah, I told her to shut up by getting the gun, because I didn't want to hear it. I mean, that is motive, and that is what is the key to this issue. I told her to shut up, right? So that to me is the most accurate assessment of what probably happened here and what lots and lots of discovery reveal. So how is that retaliation case? That's just been something I'm struggling with. You heard me say before, I quite appreciate how this kind of symbolic speech could be used to suppress, and that seems quite problematic, right? That would be a very understandable form of First Amendment argumentation. I'm just trying to figure out retaliation, because you have to have, quote, the adverse action. And it strikes me as here, the only adverse action is what we just witnessed. It's quite implausible anything else is going to happen. That, I guess I just respectfully disagree. If I flash a gun at someone... You're saying the adverse action is to be determined down the road. I think that's, and yes, I do, and also it's a fact question, as the case law makes clear. The adverse action is not the brandishing the gun. That is the adverse action that then in turn chills her and would chill a person of reasonable firmness from continuing to exercise the right. So for the next meeting. I'm just getting the theory. Theory is the next meeting. And in fact, what has happened is she didn't go to any more meetings because she was afraid. And if I may, Your Honor, and it's alleged in the complaint, the community, over 1,500 signatures were gathered to say this was intimidation and it cannot stand. Over 100 people spoke at the next county commission meeting, saying the huge majority said, absolutely, that was intimidating. It was a violation of First Amendment and it will not stand. And people were afraid to give their names on the record because of him flashing a gun at my client. So your argument is that the retaliation itself had the goal of what your complaint alleges to make her feel fearful, intimidated and physically threatened. And that those have legs is basically it. When you feel threatened, you are afraid of further actions being taken. You allege that. Is that correct? I absolutely do. You allege that she had calls in the middle of the night. Yes, I do. That she felt like she was in danger. Is that correct? Yes, absolutely. And so that falls within a retaliatory response that results in harm. Agreed. And Judge Sutton, just to fill you in on what happened earlier in the context, which is fact-based, Mr. Klaus is very close ideologically and I believe socially with Mr. Henschel, the commission chair, who reamed out the prior speaker saying, I don't want to hear that. The allegations in the complaint are that Commissioner Klaus feels the same way. And so when my client got up to criticize the Proud Boys and their embracing of them, his response was, and this is the essential allegation, is, didn't you hear what the chair just told that last person? We don't want to hear it. We don't want to hear it. Here's a gun to show you how much we don't want to hear it. Now sit down and don't say it again, which is the retaliation, because then she doesn't appear again. And many people... She obviously didn't slow her down. I mean, I've seen the thing. It doesn't change her speech. She completed her sentence. I do not have the actual time frames, but what I read of what she said afterwards was effectively completing the sentence that she was saying. Is that correct? No, I just watched it. So it's more than a sentence. But I thought, tell me this, the more important thing is, was she, the time allotted, was it shrunk? Did she use the normal time allotted or the time that was allotted? I thought the record showed that she did use the amount of time she was given. I believe she did. At least the chair said, your time's up. Is it accurate to say that shortly after the rifle was displayed, her time expired? Yeah, I think shortly after. Maybe a matter of seconds. I mean, I watched it several times. And I can tell you a fact that has not been developed yet is that she was reading a statement. She had prepared a written statement, so she wasn't just speaking extemporaneously. So she sees it, she finishes her statement, and then the whole thing washes over here that he just flashed a rifle at me. And so the context here, Judge, and the retaliation is he doesn't want to hear criticism. But it's for the future meetings. I'm just trying to figure out what the retaliation is and what the adverse action is. That's what's so complicated about the case for me. The adverse action is that he flashes a deadly weapon at her because he doesn't, as alleged, he doesn't like her speech and he doesn't want to hear it anymore. Causes her not to speak at future meetings. That's your theory of the case, right? Yes. And him doing so chilled her exercise in the future. What's your best case? Just give me your best one. The one so clearly established, U.S. Supreme Court, what's the best one? Well, I have the Zilich case, which Judge Stranz just read, that it stands to reason. Here, I've got a Supreme Court case. Give me your best U.S. Supreme Court and give me your best Sixth Circuit. I'm happy either way. Most importantly, just to make sure you understand the question, go to what it is that makes it like this case in terms of adverse action. I think you would agree, we're on the same page there, that that's the trickiest part of the case. Well, I think the case, I might agree. I'm not saying it doesn't mean you lose. I'm saying it's the case. You argue how you want to argue. I'm telling you what strikes me as difficult about the case. You deal with that how you wish. I will. I will just say for the record that I have never had a gun flashed at me. But if I did, I can tell you it would change my whole demeanor and how I conducted myself with respect to the person who flashed a gun at me. And that is the adverse action. And that was what we allege was his intent to do. I don't want to hear you anymore. And I'm serious. And there is a threat of future harm if you continue this. And it's exhibited in my AR-15, which I display with a menacing smirk on my face. The case that I would cite to you is not a U.S. Supreme Court case directly, Your Honor. But it is written by now Justice Gorsuch in the Van Dielen v. Johnson case out of the Tenth Circuit from 2002. I'll look at that one. But I specifically said U.S. Supreme Court or Sixth Circuit. Do you have a Sixth Circuit case? Well, I do. And it's the Zillage case that says. What is it about that case that is that the breaking light? What's the threat there? What's the threat? The threat there is when the mayor says that he is that the council person who's a, quote, thorn in his side should have his, you know, should have his legs broken, should be attacked, should be. And Judge Strantz read the quote. And the debate in that case is whether it's a true threat. Is that the you know, the legs. I'm trying to figure out because that would make it like this case. Right. Because it's not clear if it's a true threat. Whether he's really saying I actually am going to shoot you if you ever speak again in a meeting or if it's hyperbolic or exactly what it is. Is that the nature of the problem in that case? The nature I believe the nature of the problem in Zillage was whether it was clearly established that the threat of physical harm, which the flashing of a weapon is, I would submit, is and is a retaliatory action such that the standard or what it stands for is that it is clearly established that a citizen exercising their First Amendment rights should not be subjected to the threat of physical harm in response to that statement. And the other thing I would say is in my last eight seconds, is that the Supreme Court is quoted in Girton says there is no need for the very action in question to have previously been unlawful because the unconstitutionality of outrageous conduct obviously will be unconstitutional. That's the Supreme Court and that's Safford v. Redding 557 U.S. 364. And I would submit flashing an AR-15 at someone, as we have alleged, for speaking up and exercising their First Amendment is per se outrageous and it sends a message of future harm of any number of things. It doesn't have to be to be shot. Thank you. Thank you. Ms. Stepanski. Thank you, Your Honor. Just briefly, I think it's important to note that when Brother Counsel is making his arguments about Zillage, first of all, Zillage, what's the protected speech there? I'm going to break your legs. That's not really, that's not what we have here. We have a plaintiff who says, please make a public statement that you don't accept these behaviors that we're turning northern Michigan into a gun culture versus a hunting culture and then he displays for one or two seconds the gun and shuts it down. It's not the same as saying, this didn't come out of nowhere. I mean, she's asking him to make a statement and that's what he does. He's engaging in his own protected speech making a symbolic gesture. That's so different than Zillage. Zillage does not presage a constitutional violation in this context. And this is not like a random display of a gun. Say, for example, we're at a Board of Commission meeting and we're talking about raising salaries for the commissioners. And the public is commenting and objecting to it and he displays a gun. Okay, well that's seriously a threat and I understand where the court would be coming from in that scenario. But in this case she's saying, she's asking him, please make a public statement about this. Here's my concern. You know, we've got the Block case. I understand that he was making his own statement. But doesn't our case law say that an act taken in retaliation of the exercise of a constitutionally protected right is actionable even in cases where the act when taken for a different reason would have been proper? He has a right to have his opinion. He has a right to have his gun. But he doesn't have a right to use that to retaliate against someone who is speaking in opposition to those beliefs. But it's not a situation where they were off topic on something else and he raised the gun in retaliation. She's saying to him, we're talking about Second Amendment rights here. We're talking about the Proud Boys. We're talking about turning northern Michigan into, you know, a gun culture. Please make a statement. Please state what your position is. And he displays the gun. I'm in support of it. Whether it's popular, whether we like it, whether we don't, he's entitled to that. And in terms of clearly... My struggle is he is entitled to have his opinion, but he is not entitled to use that opinion in a context that it is used as a response in retaliation that threatens the person trying to exercise their opinion. Exactly, Your Honor. And that's the allegation here. And isn't that the allegation in the complaint? It is, but in Thaddeus Acts, the circuit on an en banc decision said we have to consider the context that the adverse action is taken. And then we can determine, even as a matter of law, whether it was constitutionally violative. And in this case, we have the second layer with the second prong of qualified immunity, where the plaintiff has a burden to put forth a clearly established case that, if not on all fours, it's got to be similar to the particularized facts that the plaintiff was facing here. This defendant would have to know in the situation he confronted, please make a statement, that what he was doing by making that statement was constitutionally violative. And I would submit that the plaintiff failed to carry their burden to submit that case law. Thank you to both of you for your helpful briefs and arguments and for answering our questions, which we always appreciate. The case will be submitted.